TREPEL v PONTIAC OSTEOPATHIC HOSPITAL

MARTIN TREPEL AND ASSOCIATES, LIMITED v RASP

TREPEL v KELLAM

Docket Nos. 67537, 67538, 67539. Submitted January 3, 1984, at Lansing.—Decided June 18, 1984. Leave to appeal applied for.

Plaintiff, Martin L. Trepel, a board-certified radiologist, contracted with Pontiac Osteopathic Hospital to provide x-ray services at the hospital. Trepel provided such services for over 20 years. In 1975 he entered into separate agreements with Drs. Martin T. Rasp and Bernard H. Green to provide the radiological services at the hospital. Those agreements were assigned to Trepel's wholly-owned partnership, Martin Trepel and Associates Limited (MTL). In 1979 the hospital informed Trepel that his contract would not be renewed. Radiology services would henceforth be provided by Dr. David A. Kellam, who had at one time been employed by Trepel. Drs. Rasp and Green agreed to stay at the hospital with Kellam. Trepel thereafter allegedly made allegations to various state agencies to the effect that there were various defects in certificates of need filed by the hospital, which was seeking a bond issue approval. The result of Trepel's letters was to delay approval and cause the hospital to obtain new financing at a higher interest rate.

Trepel brought an action against the hospital and several individual defendants alleging breach of contract and interference with an existing contract and with prospective business

REFERENCES FOR POINTS IN HEADNOTES

[1] 61A Am Jur 2d, Pleading §§ 71 et seq., 230 et seq.

[2, 3] 45 Am Jur 2d, Interference §§ 1, 7, 27.

Breach of contract, liability for procuring. 26 ALR2d 1227.

[3, 4, 7] 45 Am Jur 2d, Interference § 50.

Liability of one who induces or causes third person not to enter into or continue a business relation with another. 9 ALR2d 228.

[5, 6] 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 579, 580.

[7] 16A Am Jur 2d, Constitutional Law § 528.

[8] 7 Am Jur 2d, Attorneys at Law §§ 232, 233.

advantage. When defendant Kellam was dismissed for failure of service of process, Trepel brought a separate action against Kellam alleging interference with an existing contract and with prospective business advantage. The partnership, MTL, brought an action against Drs. Rasp and Green alleging breach of contract, interference with prospective business advantage and with contractual relations, and intentional infliction of economic harm. The hospital was joined as a defendant in that action by stipulation. The three actions were consolidated. The defendants in the first action, except Kellam, counterclaimed against Trepel, joining Berrien C. Eaton and John C. Morris, Trepel's attorneys in the contract negotiations, as counterdefendants. The counterclaim alleged, among other things, interference with the hospital's business relations and prospective business advantage based on Trepel's alleged interference with the approval of the bond issue.

The Oakland Circuit Court, Robert L. Templin, J., granted summary judgment in favor of defendants in the first case and in favor of Kellam in the case against him alone, and those claims were dismissed. Three of the four counts of the counterclaims were dismissed, as were three of the four counts of the case brought by MTL against Rasp and Green. Trepel appealed the dismissal of his complaints, MTL appealed the dismissal of Counts II and III of its complaint, and the hospital appealed the dismissal of Count I of its counterclaim. *Held:*

1. The trial court erred in granting summary judgment, on the basis of a failure to state a claim upon which relief can be granted, on plaintiff's claim of breach of contract in the first case. The court's interpretation of the contract and its ruling that certain provisions were unambiguous were inappropriate for purposes of determining the legal sufficiency of the claim.

2. Trepel's claims of tortious interference with a contract and with a prospective business advantage, in all three cases, failed to allege "improper", *i.e.,* illegal, unethical, or fraudulent, conduct in addition to intentional interference. His proposed amendment alleged no more than mere knowing and intentional interference. The trial court did not err in refusing to grant further amendment and in granting summary judgment for defendants.

3. MTL's claims against Rasp and Green also failed to show improper conduct. Mere interference for the purpose of competition is not enough to support a claim of tortious interference with contract or with prospective business advantage. The trial court's grant of summary judgment on those claims was proper.

4. The hospital's counterclaim alleging tortious interference

with prospective business advantage clearly alleged unethical conduct. The trial court erred, however, in holding that the hospital did not adequately plead the existence of a valid business expectancy. The Municipal Finance Commission's discretion in approving bond issues is not so broad as to deprive the hospital of a reasonable expectation of approval where the issue was already approved by the Hospital Finance Authority. The hospital should have the opportunity to prove its allegation that approval had been definitely scheduled.

5. The counterdefendants' right to petition the government does not preclude their liability where they have knowingly falsified information sent to a governmental agency.

6. The counterclaim against Eaton and Morris was improperly dismissed. A cause of action is pled against an attorney where it is alleged, as here, that he was personally involved in the wrongful and intentional conduct forming the basis for the cause of action, that is, that he illegally, unethically, or fraudulently interfered with a known business expectancy.

Affirmed in part and reversed in part.

1. MOTIONS AND ORDERS — SUMMARY JUDGMENT — FAILURE TO STATE CLAIM — CONTRACTS.

It is inappropriate for a trial court to interpret the provisions of a contract upon which an action is based for purposes of determining the legal sufficiency of a claim when ruling upon a motion for summary judgment based on the alleged failure to state a claim upon which relief can be granted (GCR 1963, 117.2[1]).

2. TORTS — INTERFERENCE WITH EXISTING CONTRACT.

A plaintiff, to prevail on a theory of tortious interference with an existing contract, must show that a contract existed, that it was breached, and that the defendant instigated the breach without justification.

3. TORTS — INTERFERENCE WITH BUSINESS RELATIONSHIP — COMPETITION.

The elements of a claim of tortious interference with a business relationship are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the interferer; (3) an intentional, improper, interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted; for the purpose of such an action, an "improper" interference is one which is "illegal, unethical, or fraudulent", and mere interfer-

ence for the purpose of competition is not enough to support a claim.

4. TORTS — INTERFERENCE WITH BUSINESS EXPECTANCY.

A valid business expectancy must be a reasonable likelihood or probability, not mere wishful thinking, to support a plaintiff's claim of tortious interference with a business expectancy.

5. HOSPITALS — HOSPITAL FINANCE AUTHORITY — REFINANCING DEBT.

The Michigan State Hospital Finance Authority is empowered to make loans to hospitals for refinancing outstanding debts if it determines that the refinancing is necessary to realize the objectives and purposes of the Hospital Finance Authority Act, which determination is conclusive except for approval by the Municipal Finance Commission (MCL 331.42; MSA 14.1220[12]).

6. HOSPITALS — HOSPITAL FINANCE AUTHORITY — MUNICIPAL FINANCE COMMISSION — BONDS.

The Municipal Finance Commission is limited in its review of a proposed issuance of bonds or notes by the Michigan State Hospital Finance Authority to the determination of whether the amount of the proposed issue is sufficient but not excessive, the revenue and properties pledged for the payment thereof are sufficient and the bonds or notes and the proceedings authorizing them comply with the Hospital Finance Authority Act (MCL 331.76; MSA 14.1220[46]).

7. TORTS — CONSTITUTIONAL LAW — RIGHT TO PETITION GOVERNMENT — INTERFERENCE WITH BUSINESS EXPECTATION.

The right to petition the government for redress of grievances does not preclude liability of a petitioner for tortious interference with a valid business expectation based upon knowingly falsified information sent to a governmental agency.

8. ATTORNEY AND CLIENT — DUTY TO OPPOSING PARTY — NEGLIGENCE — INTENTIONAL CONDUCT.

An attorney owes no duty of care to parties opposing his client and may not, therefore, be sued for negligence by the opposing party for his representation of a client; however, the rule does not apply in non-negligence actions and an attorney is not immune from allegations that he was personally involved in the wrongful and intentional conduct forming the basis for the cause of action.

*Schlussel, Lifton, Simon, Rands, Kaufman, Gal-*

*vin & Jackier* (by *Joseph F. Galvin* and *Phillip E. Seltzer*), for plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Roger K. Timm* and *Joanne Fiaschetti*), for Pontiac Osteopathic Hospital.

*Goldstein, Serlin, Grass & Eserow, P.C.* (by *Joel H. Serlin* and *Barry M. Rosenbaum*), for David A. Kellam.

*Collins, Einhorn & Farrell, P.C.* (by *Clayton F. Farrell* and *Noreen L. Shank*), for Berrien C. Eaton and John Morris.

Before: M. J. KELLY, P.J., and ALLEN and R. S. HOFFIUS,* JJ.

M. J. KELLY, P.J. This controversy with one more ingredient could provide the grist for a season's episodes of General Hospital. Plaintiff doctor was employed by defendant hospital as a sort of independent commission merchant for x-ray services. After several terms covering 20 years, the parties fell out with a bang, not a whimper. Plaintiff enlisted a battery of attorneys, launched a preemptive strike against defendants and fired off one, two, three lawsuits. Defendants reacted with a battalion of attorneys who returned the salvo and added numerous countering missiles of their own. The resulting fray dumps a collage of claims on this Court, disposed of summarily below, the unraveling of which we assay with great trepidation and in part reverse.

FACTS

Plaintiffs instituted actions in Oakland County

* Circuit judge, sitting on the Court of Appeals by assignment.

Circuit Court for breach of contract, interference with contractual relations and with prospective advantage, and intentional infliction of economic harm. Certain defendants counterclaimed, alleging interference with business relations and prospective business of Pontiac Oseteopathic Hospital and Paul W. Trimmer, extortion and conspiracy. The trial court granted partial summary judgment on the claims and counterclaim, by orders entered March 17, 1982, and October 6, 1982. Plaintiffs appeal as of right. Defendant hospital cross-appeals as of right.

Plaintiff Martin Trepel is an osteopathic physician and a board-certified radiologist. On November 1, 1959, Trepel and defendant hospital entered into a contract whereby Trepel, as an independent contractor, would provide x-ray services at the hospital. The contract provided for an initial term of seven years with automatic renewal for a second term unless notice of cancellation was given by either party. Trepel's compensation was to be computed as a percentage of the gross charges of the x-ray department. In 1966, the contract was automatically extended until 1973. On March 29, 1973, Trepel and defendant hospital agreed to extend the contract for one year, with a provision for automatic one-year renewals thereafter unless notice of termination was given by either party. On September 25, 1974, defendant hospital gave notice that the contract would terminate on October 14, 1975.

After receipt of the notice of termination Trepel negotiated a new contract with defendant hospital which took effect on October 15, 1975. The contract expressly provided that it would expire on December 31, 1979. As compensation, Trepel was to receive one-third of the gross billings of the

radiology and nuclear medicine departments until separate billing was instituted. Defendant hospital was required to provide facilities:

"2. *Facilities.* While this agreement is in effect, the hospital will make available to Trepel as an independent contractor adequate physical facilities, as well as equipment and supplies which the hospital deems reasonably necessary for the proper operation of the department in accordance with currently approved methods and practices and in accordance with the standards of the American Osteopathic College of Radiology and agrees to provide the services of such medical technicians and non-professional personnel including, but not limited to secretarial staff, as the administration of the hospital shall deem reasonably necessary to operate the department."

The contract provided standards which Trepel was to follow in providing services:

"8. *Scope and Standards.* All radiological or nuclear medical examinations performed by comparable osteopathic hospitals shall, within the limitations of the facilities, equipment, supplies and services furnished by the hospital (as to which see ¶ 2) be performed by Trepel or his staff physicians at the hospital in his capacity as an independent contractor."

Finally, the departments were to be governed by additional standards:

"12. *Standards.* The department shall be governed by the rules and regulations of the hospital, the American Osteopathic Association, the American College of Radiology, the hospital staff, the hospital administration, and the board of directors of the hospital."

To implement the 1975 contract, Trepel entered into separate but substantially identical agree-

ments with qualified specialists, defendants Dr. Martin T. Rasp and Dr. Bernard H. Green, to provide the radiological services at defendant hospital. For the first four years of their association with Trepel, Rasp and Green were to receive guaranteed compensation in a stated amount. Thereafter, their compensation was to be based on a profit-sharing formula. A non-competition clause limited Rasp's and Green's medical practice in Oakland County for one year after termination of their association with Trepel. Trepel assigned his interest in the agreements to his wholly-owned partnership association, Martin Trepel and Associates Limited (MTL).

Trepel was awarded the 1975 contract in spite of competition from defendant David A. Kellam. Kellam was also an osteopathic physician and a board-certified radiologist. He had been employed by Trepel from 1962 to 1966 to practice osteopathic medicine and radiology at defendant hospital. Kellam continued to negotiate with defendant hospital to provide services to the radiology and nuclear medicine departments. Rasp and Green agreed to stay on at the hospital with him should Kellam receive a contract. Kellam's efforts became successful when, in August, 1979, defendant hospital notified Trepel that his contract would not be renewed after its termination on December 31, 1979.

Because of defendant hospital's rejection, Trepel allegedly followed through on threats he had made earlier and sent letters to various Michigan agencies, including the Municipal Finance Commission (MFC). The letters alleged that there were various defects in certificates of need filed by defendant hospital. The intent behind these letters was to interfere with defendant hospital's application for

a bond issue approval from the Michigan State Hospital Finance Authority. By mid-September, 1979, defendant hospital's negotiations with the authority had resulted in the tentative approval of a proposed sale of tax-free municipal bonds in the amount of $19,720,000 with a proposed interest rate of 7.5 percent. The final step before consummation of the sale was approval by the MFC, which was scheduled to be obtained on or about September 11, 1979. The scheduled approval of the MFC was substantially delayed and, consequently, defendant hospital ran out of money and had to obtain new financing at a rate of 14.5 percent.

## PROCEDURAL HISTORY

On December 26, 1979, Trepel filed a three-count complaint (Case No. 79-198827-CZ), seeking equitable relief and monetary damages for breach of hospital rules and regulations, breach of contract and interference with prospective business interests. Defendants' motion for partial summary judgment as to Counts I and II was granted by order of March 25, 1980, but Trepel was granted leave to amend. On April 30, 1980, Trepel filed an amended complaint. Count I alleged breach of contract by all named defendants except Kellam. Count II alleged interference with contract and prospective advantage by all named defendants. On July 30, 1980, the action was dismissed as to Kellam for failure to serve him with process pursuant to GCR 1963, 102.5. On October 31, 1980, Trepel filled the gap with a complaint (Case No. 80-213833-NM) against Kellam only, alleging interference with contract and prospective advantage. The two cases were consolidated by order of March 13, 1981. The dismissal of Kellam in No. 79-198827-CZ was set aside on November 5, 1981.

On January 11, 1980, MTL filed a complaint (Case No. 80-199333-CK) premised on the violation of the non-competition clauses in Trepel's agreements with Rasp and Green. MTL filed a four-count amended complaint on February 14, 1980, for breach of contract, interference with prospective advantage and with contractual relations and intentional infliction of economic harm. On February 19, 1980, defendant hospital was joined as a defendant by stipulation. Defendants' efforts to have the amended complaint dismissed on the grounds that the non-competition clauses were invalid and unenforceable were unsuccessful and, on January 26, 1982, this action was consolidated with the first two cases.

On February 13, 1981, defendants (except Kellam) in Case No. 79-198827-CZ counterclaimed against Trepel and joined Berrien. C. Eaton and John Morris, Trepel's attorneys in the contract negotiations, as counterdefendants. Defendants twice amended their counterclaim. The first of four counts was for interference with defendant hospital's business relations and prospective advantage based on Trepel's alleged interference with the approval of the pending bond issue before the MFC.

Following a hearing on February 8, 1982, the trial court on March 17, 1982, entered an order granting partial summary judgment pursuant to GCR 1963, 117.2(1). Count I of Trepel's amended complaint in Case No. 79-198827-CZ was dismissed to the extent the purported breaches did not violate the standards of the American Osteopathic College of Radiology. Count II of the amended complaint was dismissed with prejudice for failure to allege improper conduct. Counts I, III and IV of the second amended counterclaim were dismissed with prejudice.

Another hearing was held on July 12, 1982, to consider and reconsider the propriety of summary judgment as to the various counts in the claims and counterclaim. On October 6, 1982, the trial court entered an order granting summary judgment with an express determination of finality. The order of March 17, 1982, was affirmed and, in addition, Count I of Trepel's amended complaint in Case No. 79-198827-CZ was dismissed in its entirety; Counts II, III and IV of MTL's amended complaint in Case No. 80-199333-CK were dismissed; and Trepel's complaint against Kellam in Case No. 80-213833-NM was dismissed for the same reasons as were the second counts in the other two amended complaints.

Trepel appeals as of right the dismissal of the amended complaint in Case No. 79-198827-CZ and the complaint against Kellam in Case No. 80-213833-NM. MTL appeals as of right the dismissal of Counts II and III of its amended complaint in Case No. 80-199333-CK. Defendants have not cross appealed from the denial of their motion to dismiss Count I. Defendant hospital cross appeals as of right the dismissal of Count I of the second amended counterclaim in Case No. 79-198827-CZ.

I

*Did the trial court err in dismissing with prejudice Count I of the amended complaint in Case No. 79-198827-CZ alleging breach of contract, for failure to state a claim upon which relief can be granted?*

We believe the court did err in this regard. Defendants filed their motion for summary judgment pursuant to GCR 1963, 117.2(1) for failure to

state a claim. On March 17, 1982, the court entered the following order:

"Defendants' motion is denied to the extent that the purported breaches set forth in the amended complaint violate 'the standards of the American Osteopathic College of Radiology.' The motion is granted to the extent the purported breaches alleged in the amended complaint do not violate such standards."

Defendants were permitted to renew their motion in order to show that the AOCR standards were not violated. Defendants did so and their motion was granted with the express determination that it should be appealable as a final order.

Plaintiff does not argue that the trial court erroneously determined that the breaches were not in violation of the AOCR standards. Plaintiff claims there are additional standards which the court ignored, namely, "currently approved methods and practices" as excerpted from ¶ 2 of the contract. The court found that designation "very ambiguous". The court held that the complaint stated a claim inasmuch as it alleged a breach of the agreement and, zeroing in on ¶ 2, the court noted an objective standard—the AOCR standards —and a subjective standard: "reasonably necessary in accordance with currently approved methods and practicies". The court held that plaintiff had stated a legally sufficient claim as to the AOCR standards, but not as to the "reasonably necessary" standard.

Furthermore, in one area the trial court found the "currently approved methods" standard ambiguous, and in the next colloquy it lumped the standard in with the "reasonably necessary" language. We find that the court was in actuality interpreting provisions of the contract which is

inappropriate for purposes of determining legal sufficiency of a claim. We hold that the court erred in ruling that the standards in ¶ 2 were unambiguous. The ambiguity raises a question of fact in the pleadings which should not have been disposed of by dismissal under GCR 1963, 117.2(1).

Plaintiff's argument—that the trial court's reliance on the merger clause of the agreement to reject any implied duties effectively relieved defendants of the duty of good-faith performance—adds nothing to the analysis. The question of good faith arises where defendants have discretion to determine what is reasonably necessary under ¶ 2 of the agreement. See *Attorney General v Michigan National Bank,* 110 Mich App 106, 124-125; 312 NW2d 405 (1981), *rev'd on other grounds,* 414 Mich 948; 325 NW2d 777 (1982). Because the trial court erred in ignoring the "reasonably necessary" language, it did not reach the question of good faith.

## II

*Did the trial court err in dismissing with prejudice plaintiffs' claims for tortious interference with contract and prospective advantage contained in all three lawsuits?*

Plaintiffs have alleged two separate tort actions in the various counts[1] discussed in this issue: interference with contract and interference with prospective advantage. This Court, in *Northern Plumbing & Heating, Inc v Henderson Bros, Inc,* 83 Mich App 84, 92-93; 268 NW2d 296 (1978), *lv den* 405 Mich 845 (1979), stated the elements of these two torts:

---

[1] These are Count II in Case No. 1, by which we mean the case filed first in time, lower court No. 79-198827-CZ, Court of Appeals No. 67537, and Counts II and III in both other lawsuits.

"To prevail on this theory [tortious interference with an existing contract], plaintiff must show that a contract existed, that it was breached, that [defendant] instigated the breach and that it did so without justification. *Dassance v Nienhuis,* 57 Mich App 422; 225 NW2d 789 (1975).

\* \* \*

" 'The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.' " Quoting 45 Am Jur 2d, Interference, § 50, p 322.

As to the latter tort, see also *Wilkerson v Carlo,* 101 Mich App 629, 632; 300 NW2d 658 (1980), *lv den* 411 Mich 984 (1981).

In *Weitting v McFeeters,* 104 Mich App 188, 197; 304 NW2d 525 (1981), a panel of this Court, relying on 4 Restatement Torts, 2d, § 766B, stated that the interference with a business relationship must be improper in addition to being intentional. Improper means "illegal, unethical, or fraudulent". 104 Mich App 198. See also *Northern Plumbing, supra,* pp 99-101 (DANHOF, C.J., *dissenting), Meyering v Russell,* 53 Mich App 695, 709-713; 220 NW2d 121 (1974), *reversed* 393 Mich 770; 224 NW2d 280 (1974), adopting the dissenting opinion of O'HARA, J.

While the term "improper" would apply also to interference with an existing contract, it is not apparent that the same definition should apply. Chief Judge DANHOF, dissenting in *Northern Plumbing, supra,* p 100, stated:

"The social desirability of encouraging competition will justify some actions in an advantageous business relationship case which would be tortious if a contract existed."

The trial court, however, interpreted the requirement that interference with a contract be without justification to be identical to the requirement of "improper" conduct interfering with prospective advantage. The trial court held that plaintiffs had failed to plead "improper" conduct by any of the defendants in any of the various counts.

A. *Count II in lower court #S 79-198827-CZ and 80-213833-NM.*

Trepel has alleged that defendants made efforts to eliminate him from defendant hospital, terminate his agreement, and replace him with Kellam. Trepel characterized this as unlawful and intentional interference. Trepel also alleged that defendant hospital refused "to renegotiate [his] contract in good faith" and refused "to deal". It is apparent that these allegations do not plead "illegal, unethical or fraudulent conduct". Trepel concedes as much by focusing his appeal on the "potentially meritorious" grounds raised in the July 12, 1982, hearing which he argues justify a grant of leave to amend. Those "grounds" allege interference with Trepel's contracts with Rasp and Green. Trepel's theory is that, since Rasp and Green were the only available radiologists to staff the department at defendant hospital and since they had contracts with him, he had a valid business expectancy in remaining at defendant hospital. Trepel claims that defendant hospital could not replace him due to the shortage of radiologists and that defendants' inducement of Rasp and Green to breach their contracts and remain at defendant hospital under Kellam's supervision satisfied the "improper" con-

duct requirement for interference with Trepel's prospective advantage in obtaining a renewed contract with defendant hospital.

Trepel's argument posits some expansion on the authorities cited in his brief. Defendants' interference with Rasp's and Green's contracts, while perhaps subjecting them to liability for that interference, should not make defendants liable on their own contracts with Trepel. While the breach of Rasp's and Green's contracts may be a condition of defendants' alleged breach, it is not causally related. Furthermore, under *Weitting,* Trepel must show illegal, unethical, or fraudulent conduct in addition to intentional interference. Trepel's proposed amendment does not allege more than mere knowing and intentional interference. We endorse the *Weitting* panel's interpretation and find it futile to give Trepel further opportunity to amend his complaint; the trial court's grant of defendants' motion for summary judgment is affirmed. *Meyer v Hubbell,* 117 Mich App 699, 705-706; 324 NW2d 139 (1982), *lv den* 417 Mich 993 (1983).

B. *Counts II and III of No. 80-199333-CK.*

In these abbreviated counts MTL has made the conclusory allegation of unlawful and intentional interference. In its brief, MTL argues that Rasp and Green tortiously interfered with MTL's prospective advantage in obtaining further continuity at defendant hospital by violating their covenants not to compete and by agreeing to work for Kellam while Trepel was still involved in negotiations with defendant hospital. Kellam allegedly interfered by inducing Rasp's and Green's violations of their covenants not to compete.

MTL insists that intentional inducement to breach a contract is all that is required to show unlawful interference, citing the Restatement and

old case law. We hold that this Court now requires allegations of "improper" conduct. Mere interference for the purpose of competition is not enough. *Weitting, supra,* pp 197-198. Since MTL has not alleged impropriety the trial court's denial of leave to amend was not an abuse of discretion.

## III

*With regard to defendant hospital's counterclaims did the trial court err in granting summary judgment on the claim for tortious interference with prospective advantage on the ground that Count I of the counterclaim failed to allege an issue as to any material fact which could establish the existence of a valid business expectancy?*

## A

Count I of defendant hospital's second amended counterclaim alleges tortious interference with prospective advantage. Unlike plaintiffs' claims, the counterclaim clearly alleges unethical conduct —sending letters knowing them to contain false allegations. However, the trial court held that defendant hospital did not adequately plead another element—the existence of a valid business expectancy. The expectancy must be a reasonable likelihood or probability, not mere wishful thinking. *Schipani v Ford Motor Co,* 102 Mich App 606, 622; 302 NW2d 307 (1981), *Behrend v Bell Telephone Co,* 242 Pa Super 47, 62; 363 A2d 1152 (1976), *vacated,* 473 Pa 320; 374 A2d 536 (1977). Defendant hospital alleged that, having obtained approval from the Michigan State Hospital Finance Authority on August 23, 1979, it expected approval by the MFC on or about September 11, 1979. Consideration by the MFC was impeded and

defendant hospital had to refinance at a much higher rate. Two questions emerge: whether defendant hospital could reasonably expect approval of the bond issue by the MFC and, if so, whether defendant hospital could expect that approval without a substantial delay.

The proposed bond issue by the Michigan State Hospital Finance Authority was governed by the Hospital Finance Authority Act, MCL 331.31 *et seq.;* MSA 14.1220(1) *et seq.* The authority has the power to make loans to hospitals for the purpose of refinancing outstanding debts if it determines that the refinancing is necessary to realize the objectives and purposes of the act. MCL 331.42; MSA 14.1220(12). The determination is conclusive except with respect to the approval of the MFC. *Id.* In this context, the MFC does not exercise its powers and discretion under the Municipal Finance Act, MCL 131.1 *et seq.;* MSA 5.3118(1) *et seq.* Rather, the MFC is specifically limited by MCL 331.76; MSA 14.1220(46), which states in part:

"Before approving the issuance of the bonds or notes the municipal finance commission shall determine that the amount of the proposed issue is sufficient but not excessive, that the revenue and properties pledged for the payment thereof are sufficient and that the bonds or notes and the proceedings authorizing the same comply with this act and other applicable law."

We find that the discretion of the MFC is not so broad as to deprive defendant hospital of a reasonable expectation that the bond issue would be approved. No Michigan cases have been found relating to interference with discretionary governmental action. The cases cited by the parties are not directly on point but are helpful.

In *Lewis v Bloede,* 202 F 7 (CA 4, 1912), plaintiff had put in the low bid for providing black ink to the United States Treasury Department. The Bureau of Engraving and Printing determined that plaintiff's ink was the best quality. Plaintiff's bid then had to be approved by the "committee of three". This committee would give automatic approval unless it received a report to the contrary from an officer of the department known as the "chemist and inkmaker". The Fourth Circuit Court of Appeals held that plaintiff had a cause of action where the chemist and inkmaker, in concert with codefendant, maliciously submitted a false report to the committee of three which resulted in the rejection of plaintiff's bid. *Lewis* does not discuss what allegations are required in the pleadings since it involved the propriety of a directed verdict. The court held, however, that where plaintiff seeks to prove intentional and malicious interference with an expectancy to enter into a contract as distinguished from a contract already executed, plaintiff must prove that he "would, but for the malicious interference of defendants, have entered into the contract." 202 F 17. Because in *Lewis* the committee of three had already indicated that plaintiff was the low bidder and would be awarded the contract subject only to the chemist and inkmaker's final approval, the court ruled that a directed verdict was not in order.

*Pedersen v United States,* 191 F Supp 95 (D Guam, 1961), also involved an ultimately unsuccessful bidder but in the context, as here, of a motion to dismiss for failure to state a claim. Plaintiff alleged that he had submitted the high bid for the purchase of certain obsolete ammunitions. A lower bidder, in concert with certain United States Air Force officers, maliciously sub-

mitted derogatory information about plaintiff to the person charged with the responsibility of awarding the purchase contract. Plaintiff's bid was rejected. Plaintiff alleged that but for the wrongful interference he would have been awarded the contract. The court held that plaintiff's complaint stated a claim upon which relief could be granted.

Somewhat different from the above two cases in *Carr v Brown,* 395 A2d 79 (DC App, 1978). Plaintiff had applied to the City Council Transportation Committee for permission to close and relocate a portion of an alley. The committee was to make a decision only after hearing interested parties. Opposition to any such application was invited so that an informed and prudent decision, after consideration of all viewpoints, could be rendered. The court held that plaintiff's expectancy of approval within a specified time period was simply too remote. Also, to attempt to determine the reason for the delay would lead to futile speculation. The court emphasized that it was *not* dealing with a case involving alleged interference with business due to malicious official refusal to issue necessary permits nor with a claim by the plaintiff that he had an expectancy of doing business with a governmental body which expectancy was unjustifiably interfered with by the defendant. *Id.,* p 84.

In the instant case, the discretion to be exercised by the MFC appears to be somewhat greater than that attributed to the governmental bodies in *Lewis* and *Pedersen, supra,* but significantly less than that in *Carr.* We perceive that *Carr* is a gloss on the general rule. It applies to situations where too many factors are in play to be able to reasonably infer that, but for defendant's allegedly wrongful action, plaintiff likely would have obtained the desired advantage. In this case, the MFC's grant of approval must be preceded by the

determinations required by statute. A trier of fact might be persuaded that defendant hospital could ascertain with reasonable certainty whether the items listed in the statute were satisfied so that MFC approval was a probability. If the question were whether defendant hospital's application for a loan was denied because of counterdefendants' interference, defendant hospital would have made out a cause of action because a trier of fact could assess the causal effect of the counterdefendants' actions.

However, where the MFC approval is only delayed, as alleged here, the problem becomes more difficult. The MFC is required to make findings of fact before granting approval. Obviously, that task takes a certain amount of time to accomplish. However, the procedure involved is not a notice and comment type hearing, as in *Carr,* designed to let interested parties express their opposition. Defendant hospital should have the opportunity to prove its allegation that approval was "scheduled" for September 11, 1979.

In *Lewis, supra,* pp 20-21, and *Carr, supra,* p 84, reference is made to the prior history of the governmental entity in granting approval. Defendant hospital has sought to introduce evidence by way of affidavit of the MFC's perfect record in approving bond issues already approved by the Michigan State Hospital Finance Authority. We believe such evidence if otherwise admissible could persuade a trier of fact at a contested trial.

B

Counterdefendants argue an alternative theory for dismissing the second amended counterclaim, which the trial court did not reach, namely that

counterdefendants' interference was privileged by the First Amendment right to petition the government for redress of grievances. The hospital argues that counterdefendants' actions fall within a "sham petitioning" exception. The right to petition government has been considered at length in antitrust litigation under the Sherman Act. In *Eastern Railroad Presidents Conference v Noerr Motor Freight,* 365 US 127; 81 S Ct 523; 5 L Ed 2d 464 (1961), *reh den* 365 US 875; 81 S Ct 899; 5 L Ed 2d 864 (1961), and *United Mine Workers of America v Pennington,* 381 US 657; 85 S Ct 1585; 14 L Ed 2d 626 (1965), the Supreme Court held that defendants' conduct was privileged in spite of allegations of malicious and fraudulent acts with the overriding purpose of destroying competition. However, the Sherman Act would apply where action, "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor". *Noerr, supra,* p 144. In *California Motor Transport Co v Trucking Unlimited,* 404 US 508; 92 S Ct 609; 30 L Ed 2d 642 (1972), the Court applied the "sham" exception where defendants had engaged in concerted action to deny plaintiffs access to petition the government by going to court on every application filed by plaintiffs. Unethical behavior condoned in the political arena was not immunized when used in the adjudicatory or administrative processes. *Id.,* p 513. The sham exception has been broadened in recent lower court cases. See *Clipper Exxpress v Rocky Mountain Motor Tariff Bureau, Inc,* 674 F2d 1252 (CA 9, 1982), *modified* 690 F2d 1240 (CA 9, 1982), *cert den,* — US —; 103 S Ct 1234; 75 L Ed 2d 468 (1983), *Sage International, Ltd v Cadillac Gage Co,* 507 F Supp 939 (ED Mich, 1981).

In *Sierra Club v Butz,* 349 F Supp 934 (ND Cal, 1972), the *Noerr-Pennington* doctrine and sham exception were applied by analogy in the context of a counterclaim for interference with advantageous relationship. The court rejected the "malice" standard, holding that something more than improper motive was required. The court also analyzed defamation cases, noting that the First Amendment will not protect a speaker who knows his statements are false. We are persuaded by the analysis in *Butz* that the right to petition does not preclude liability where counterdefendants have knowingly falsified information sent to a governmental agency. It should also be noted that the content of the letter sent to the MFC did not relate to the items listed in the statute for the MFC to review. The MFC was not in a position to do anything about the informmation in the letter. It is apparent that counterdefendants' petition was therefore a sham.

## C

Counterdefendants Eaton's and Morris's argument that they are privileged as attorneys working on behalf of their client is unpersuasive. It is true that attorneys owe no duty of care to parties opposing their client and may not therefore be sued in negligence by the opposing party for attorney representation of a client. *Friedman v Dozorc,* 412 Mich 1; 312 NW2d 585 (1981). However the same rationale does not apply in non-negligence actions, where elements other than duty of care are required. In *Sovereign v Hart,* 363 Mich 32, 36; 108 NW2d 758 (1961), for example, the Supreme Court held that while an attorney does not become liable to an opposing party for deceit merely by filing a complaint containing untrue allegations, a

cause of action is pled against that attorney where it is alleged that the attorney " 'counseled and caused the said allegations to be made,' knowing them to be false, in order to deceive the court". Thus, attorneys are not immune from allegations that they were personally involved in the wrongful and intentional conduct forming the basis for the cause of action.

In this case, defendant hospital alleges that Eaton and Morris had personal knowledge of the hospital's business expectancy and that they personally and intentionally interfered with that expectancy with illegal, unethical, or fraudulent intent. We find that the trial court erred in dismissing the hospital's counterclaim against these counterdefendants.

## Decision

We affirm in part and reverse in part.

The trial court's grant of defendants' motion for summary judgment as to Count I of the amended complaint in the first action is reversed.

We affirm the dismissal of plaintiff's claims for interference with contract and with prospective advantage in all three lawsuits. We affirm the trial court's denial of leave to amend as plaintiffs failed to allege illegal, unethical, or fraudulent conduct.

We reverse the dismissal of defendant hospital's counterclaim against Trepel and his attorneys and order the same reinstated.

No costs, no party having fully prevailed.