865 F.2d 260
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Paul ONACHUK, Paul N. Onachuk and Holbrook TBA Sales
Company, Plaintiffs-Appellees, Cross-Appellants,
v.
SUN REFINING AND MARKETING COMPANY, Defendant-Appellant,
Cross-Appellee.
 Nos. 87-2206, 87-2207.
 United States Court of Appeals, Sixth Circuit.
 Dec. 13, 1988.
 
 Before LIVELY and WELLFORD, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 In 1976, the defendant, Sun Refining and Marketing Co. ("Sun"), decided to distribute tires, batteries, and automotive accessories ("TBA") to its Detroit Sunoco service station dealers through independent distributors. The distributors would buy Sun products at a listed price and would sell these same products to dealers at a higher listed price. The distributors would be responsible for delivering products, maintaining adequate levels of inventory, paying storage costs, and giving good service to the dealer customers.
 
 
 2
 On May 1, 1976, Holbrook TBA Sales Company, a corporation, (owned and operated by Paul Onachuk and his son, Paul N. Onachuk) signed a Distributor Franchise Agreement with Sun. The most important portions of the agreement reflected that (1) Sun products would be made available to distributors "for resale at competitive prices"; (2) the distributor was prohibited from representing "himself as the exclusive supplier of such TBA merchandise to Company branded independent service station dealers"; (3) Sun retained "the right to sell to any customer within the area served by the Distributor"; and (4) the right of either party to terminate the franchise agreement upon sixty days written notice to the other. There was no express date of termination of the agreement. The distributor agreement established an essentially at-will relationship between Holbrook and Sun.
 
 
 3
 After the switch to the independent distributor system, and once the dealers grew accustomed to working with the distributors, sales of Sun's tire, battery, and accessories improved greatly. For approximately nine years, May 1976 through May 1985, Holbrook and Sun enjoyed a good relationship. Both sides apparently complied with the distributor agreement, and Holbrook maintained what the Onachuks claimed to be a satisfactory profit margin on Sun products. Sun basically stopped dealing directly with the dealers on items handled by Holbrook and similar distributors.
 
 
 4
 In late 1984, the Onachuks heard a rumor that Sun would begin to sell tires, batteries, and accessories directly to Detroit Sunoco dealers. Although representatives of the company initially denied the rumor, in May 1985, Sun's Michigan division manager, Mr. Kaser, announced that a direct sales program would be established. As a result of this direct sales program, the dealers in Holbrook's territory were placed in a category which resulted in a drastic reduction of Holbrook's profit margin.
 
 
 5
 In the summer of 1985, Sun salesmen visited independent service station dealers to persuade them to buy directly from Sun. Holbrook alleged that the salesmen threatened the dealers and customers of Holbrook that Sun would not renew franchise contracts or give gas rebates if direct orders were not given to Sun. Plaintiff also asserted that Sun's salesmen spread word that Holbrook had discontinued its Sun tire, battery, and accessory sales. Sun denied these latter allegations.
 
 
 6
 Holbrook, however, continued to sell tires, batteries, and accessories as a distributor until December 1985, when the business closed.[1] At that point, Holbrook had approximately $42,000 of Sun TBA in inventory. It had approximately $100,000 to $110,000 worth of Sun inventory when Sun began its direct sales.
 
 
 7
 In February 1986, Holbrook sued defendant alleging breach of contract, fraud and deceit, innocent misrepresentation, breach of fiduciary relationship, promissory estoppel, interference with business relations, intentional infliction of emotional distress, violation of Michigan franchise law, and restraint of trade. Sun filed a counterclaim to collect the balance of an account owed to it by Holbrook. Upon Sun's motion, the district court granted the defendant's motion for summary judgment on the counterclaim and on all but two claims in the amended complaint (breach of contract and intentional interference with business relations).
 
 
 8
 During the trial, the district judge directed a verdict in favor of the defendant on the breach of contract claim. The remaining intentional interference claim was submitted to the jury. The district court instructed the jury that damages for intentional interference were to be determined by considering loss of business value, loss of income, inventory purchases, and loss of profit on inventory purchases, but he refused to instruct the jury on exemplary damages. The jury returned a verdict in favor of the plaintiff for $361,000.
 
 
 9
 Both parties have appealed after the district court denied Sun's motion for a judgment notwithstanding the verdict and/or for a new trial.
 
 
 10
 A. Intentional Interference with Business Relations--Sufficiency of Evidence
 
 
 11
 The defendant contends that Holbrook failed to establish all of the elements of intentional interference with business relations. In Michigan, the elements of this tort are (1) the existence of a valid business relationship; (2) knowledge of that relationshp or expectancy on the part of the interferer; (3) intentional interference causing breach or termination of the relationship or expectancy; and (4) damage to the party whose relationship or expectancy was disrupted. Meyer v. Hubbell, 117 Mich.App. 699, 324 N.W.2d 139 (1982). Mere interference for purposes of competition is not enough to support a claim of tortious interference; rather, a plaintiff must show that the defendant acted illegally, unethically, or fraudulently. Trepel v. Pontiac Osteopathic Hospital, 135 Mich.App. 361, 354 N.W.2d 341 (1984).
 
 
 12
 Holbrook clearly had valid business relationships with various independent service station owners, and Sun knew of these relationships because Holbrook submitted monthly customer lists to Sun. If the jury believed the testimony of dealers Al Sheridan, Joseph Bommarito, and Paul Onachuk himself, the other elements of intentional interference liability might be established despite contrary testimony from Sun officials and representatives.
 
 
 13
 Sheridan stated that he had dealt with Holbrook since 1978, and that Holbrook's service was "excellent." He testified that he never bought tires, batteries, and accessories directly from Sun until 1985, when Roger Authur, a Sun representative, allegedly told him that Sun would be selling these items to dealers directly and urged that he buy such products directly from Sun. Sheridan also testified that Willie Stanton, a Sun salesman, repeated this message and told him that a failure to buy such items directly from Sun would result in a loss of other benefits. Sheridan concluded: "I thought it would be better just to buy from Sun Oil than it would be from Mr. Onachuk." A Sun representative denied such efforts to disparage Holbrook, and maintained the salesmen were simply trying to sell Sun products directly.
 
 
 14
 Another service station owner, Joseph Bommarito, testified that he first purchased tires, batteries, and accessories from Sun in February 1986. He had purchased these products from Holbrook since 1976. Bommarito stated that he switched because Stanton told him that if he did not buy direct, his gas contract would not be renewed. Finally, Paul Onachuk testified that he overheard a Sun driver saying that Sun officials had told dealers in 1984 and 1985 that Holbrook no longer would be selling such Sun items. Again, defendant's witnesses generally denied these assertions.
 
 
 15
 On the question of damages, Paul N. Onachuk claimed that Holbrook's business as a distributor closed in December 1985 because "Sunoco sales reps [were] telling their dealers not to buy from [Holbrook] anymore." The new price system and Sun competition allegedly had cut Holbrook's profit margin by two-thirds on tires, batteries, and accessories, forcing Holbrook out of the market, according to Onachuk's testimony. The Onachuks did not look for a new supplier or source of such products because they also operated a Sunoco gas station. There was no testimony that Sun precluded such an operation, however.
 
 
 16
 In Michigan, "the standard of sufficiency of evidence to support a jury verdict is clear: if reasonable men could differ as to the meaning of the evidence when facts are viewed in the light most favorable to the prevailing party, the evidence is sufficient to support the verdict." Wiskotoni v. Michigan National Bank-West, 716 F.2d 378, 383 (6th Cir.1983) (citing Birou v. Thompson-Brown Co., 67 Mich.App. 502, 509, 241 N.W.2d 265, 269 (1976)). While there is ample evidence in the record supporting Sun's contentions, there is also evidence supporting Holbrook's charge as to intentional interference. It is not for us to decide the credibility issues; we find no error in the district court's denial of defendant's motion to set aside the jury verdict on the question of liability. At the same time, we affirm the district court's actions on dismissal of plaintiff's other claims, and we discuss the breach of contract and promissory estoppel claims subsequently.
 
 B. Damages
 
 17
 Several damages questions are involved in this appeal: first, whether the court should have instructed the jury on exemplary damages, and second, whether the instructions on the measure of damages actually presented to the jury on intentional interference was erroneous, and, finally, whether the verdict on compensatory damages was based on speculation and surmise.
 
 1. Exemplary Damages
 
 18
 The trial judge, after hearing the evidence presented by both parties, decided not to instruct the jury on exemplary damages. Sun maintains that "because exemplary damages are neither permitted under Michigan law nor supported by the evidence introduced at trial," this action was correct. Holbrook, on the other hand, contends that Michigan law does permit exemplary damages in intentional interference with business relations cases and believes that the trial court erred by failing to instruct the jury on this issue.
 
 
 19
 In Joba Construction Co., Inc. v. Burns and Roe, Inc., 121 Mich.App. 615, 329 N.W.2d 760 (1982), a contractor brought a claim of tortious interference with economic relations against consulting engineers, alleging that the firm of engineers wrongfully persuaded the city's public lighting commission not to award it a contract.
 
 
 20
 On appeal from an award of exemplary damages, the defendant claimed that the plaintiff was not entitled to recover exemplary damages "as it was incapable of suffering the sort of injury for which exemplary damages are intended to compensate." 329 N.W.2d at 773. In that case the defendant insisted (1) that the plaintiff suffered a purely monetary loss, and, therefore, exemplary damges were not proper, and (2) "that a corporate body is incapable of suffering humiliation, sense of outrage and indignity and, therefore, it is not entitled to recover exemplary damages." Id.
 
 The Joba court held:
 
 21
 Although it is true that, as a general rule, exemplary damages will not be awarded to compensate a purely pecuniary grievance susceptible to full and definite monetary compensation, Durfee v. Newkirk, 83 Mich. 522, 47 N.W. 351 (1890), in the case at bar, the damage inflicted upon plaintiff was not susceptible to precise and definite measurement. In addition to suffering lost profits, which are inherently incapable of precise measurement, plaintiff may well have suffered injury to its reputation as a skillful and competent construction company.
 
 
 22
 .............................................................
 
 
 23
 ...................
 
 
 24
 * * *
 
 
 25
 Furthermore, we are unpersuaded by defendant's argument that plaintiff's status as a corporation precludes it from receiving exemplary damages. Defendant's argument urges an unduly restrictive interpretation of the concept of exemplary damages. Exemplary damages are awarded not only to compensate for injured feelings but also to compensate for injuries not capable of precise computation resulting from malicious conduct. Our decision today is consistent with prior decisions of this Court which have approved the practice of awarding exemplary damages to corporations in the proper circumstances. See Hayes-Albion Corp. v. Kuberski, 108 Mich.App. 642, 311 N.W.2d 122 (1981); Shwayder Chemical Metallurgy Corp. v. Baum, 45 Mich.App. 220, 206 N.W.2d 484 (1973). Id. at 773.
 
 
 26
 Exemplary damages are thus recoverable under Michigan law, but because we believe that plaintiff's damages in this case are susceptible to proof of reasonably ascernible damages and because we find the proof of malicious and wilfull conduct to be insufficient, we find no reversible error to the district court's decision on the issue of punitive damages.
 
 2. Measure of Damages
 
 27
 The $361,000 damages award was based upon the testimony of Mark Jahnke, a CPA, offered by Holbrook. Using a "capitalization" formula, Jahnke found that Holbrook generally made $34,000 profit annually on its distributorship business, and then multiplied this estimated profit by a "continuing concern" factor of seven years (which equates to approximately a 15% rate of return) to arrive at a value of the tires, batteries, and accessories business. This number, plus $17,000 of lost profits on inventory sold between May and December of 1985, and the value of inventory held at the time the direct sales program was initiated resulted in the award of $361,000, according to plaintiff, which maintains it is a warranted amount.
 
 
 28
 A recent Michigan tortious interference case stated that "[f]or a plaintiff to be entitled to damages for lost profits, the losses must be subject to a reasonable degree of certainty and cannot be based solely on conjecture or speculation." Bonelli v. Volkswagen of America, Inc., 166 Mich.App. 483, 421 N.W.2d 213, 226 (Mich.App.1988). We believe that the damages award in this case is clearly speculative and should not be allowed to stand under the Bonelli rationale.
 
 
 29
 Mr. Jahnke expressly stated that he was prepared to testify to damages resulting from a breach of contract and was not prepared to discuss damages flowing from tortious interference. In addition, Holbrook failed to present sufficient financial data corroborating Jahnke's testimony.[2] Here, Holbrook is entitled to damages which represent reasonable losses shown to have directly resulted from the tortious interference with its business. That amount is far less than the $361,000 awarded by the jury.
 
 
 30
 Holbrook maintained that loss of the distributorship would cut its profit margin by two-thirds. Under its contract, however, the distributorship business was terminable upon sixty days' written notice. It was error, therefore, to use an annual profit figure multiplied by a number of years to arrive at a value of the business. At best, a much smaller figure for anticipated loss of profits would be justified. In addition, the jury awarded Holbrook $127,000 for inventory value or loss. At the time of trial, however, the amount of unsold inventory was approximately $40,000. This figure would have to be offset against the alleged loss of inventory claim.
 
 
 31
 In any event, because of the various errors and speculation involved in the jury's award of damages, we remand the damages issue for a new trial. We have given plaintiff the benefit of considerable doubt because its proof at trial on damages was clearly insufficient on the tortious interference claim.
 
 C. Breach of Contract Claim
 
 32
 At the close of plaintiff's proof, the district court directed a verdict in favor of defendant on plaintiff's breach of contract claim. Plaintiff asserts that the defendant did not retain the right to sell directly to independent service stations and breached its contract when it began to do so in 1985. Second, the plaintiff argues that the distributor agreement guaranteed it a certain profit margin.
 
 
 33
 With regard to the first contention, Holbrook argues that the contract language is ambiguous and that the court should have admitted extrinsic evidence regarding the definition of the term "customer." Paragraph 4 of the distributor agreement reads: "Company retains the right to sell to any customer within the area served by the Distributor." Holbrook submits that the term "customer" is latently ambiguous because it was not intended to refer to "independent service station dealers." Holbrook insists that because the agreement was prepared by Sun, it must be construed strictly against Sun. See Dudley v. Rapanos, 353 Mich. 237, 91 N.W.2d 274 (1958). We find Holbrook's position on this issue to be untenable.
 
 
 34
 The Michigan Supreme Court has interpreted the word "any" very broadly in Harrington v. Interstate Business Men's Acc. Association of Des Moines, 210 Mich. 327, 178 N.W. 19 (1920). Webster's New Collegiate Dictionary defines "customer" as "one that purchases." The plain meaning of "any customer" would indicate Sun's reserved right to sell to anyone, including independent service station owners. In addition, Paul Onachuk admitted that "independently branded Sunoco service station dealers" were "customers" within the meaning of the distributor agreement. It is clear that paragraph 4 of the contract fairly admits of but one interpretation, contrary to that asserted by plaintiff.
 
 
 35
 In Michigan, contracts which are unambiguous are not open to construction and must be enforced as written. Britton v. John Hancock Mutual Life Insurance Co., 30 Mich.App. 566, 186 N.W.2d 781 (1971). That the parties disagree about the meaning of contract terms does not necessarily establish the existence of an ambiguity in a legal sense. Summary judgment in such a situation involving the plain meaning of a contract may be appropriate. Steinmetz Electrical Contractors Association v. Local Union No. 58, International Brotherhood of Electrical Workers, AFL-CIO, 517 F.Supp. 428 (E.D.Mich.1981).
 
 
 36
 Generally, proof concerning preliminary negotiations may be considered only when the contract is ambiguous. See Keller v. Paulos Land Co., 5 Mich.App. 246, 146 N.W.2d 93 (1966), aff'd, 381 Mich. 355, 161 N.W.2d 569 (1968). When the meaning of the words used in the contract are clear, preliminary negotiations are considered to have been merged into the final, written agreement. See Keller, 5 Mich.App. 246, 146 N.W.2d 93. Any alleged statements made by Sun representatives before the agreement was signed to the effect that Sun would not initiate a direct sales program were properly excluded by the district court. We hold that paragraph 4 is not ambiguous, and Sun clearly retained the right to deal directly to any customers, including dealers. Sun did not breach its contract with Holbrook in that respect.[3]
 
 
 37
 The plaintiff's second breach of contract argument is that the distributorship agreement guaranteed the plaintiff an adequate, yet undisclosed, profit margin, and that this guarantee was broken when Sun changed its pricing structure in 1985. It argues that Sun's actions in adjusting prices for Holbrook's benefit over a nine-year period support such an interpretation. The trial judge, however, was not in error in holding that "there appears to be nothing in this agreement ... that guarantees that the company will not sell at a lower price."
 
 
 38
 Paragraph 1 of the contract, furthermore, provides that "[t]he prices for all such merchandise shall be subject to change without prior notice to Distributor." Plaintiff therefore cannot prevail on its claim of guaranteed profit margins under the agreement.
 
 D. Promissory Estoppel
 
 39
 Holbrook contends that the trial court erred when it granted the defendant's motion for summary judgment on its promissory estoppel claim. In order for Holbrook to state a valid cause of action for promissory estoppel, it must show: (1) a promise by Sun not to engage in the sale of TBA directly to dealers and a promise not to change the pricing structure; (2) justifiable reliance by Holbrook on Sun's promise; and (3) a need to enforce the promise to avoid injustice. In re Timko Estate, 51 Mich.App. 662, 215 N.w.2d 750 (1974).
 
 
 40
 Holbrook asserts that its reliance on Sun's alleged promise not to compete was justified because Sun, over a nine-year period, repeatedly promised that Sun would not sell directly and that Sun would allow Holbrook to maintain reasonable profit margins. For nine years Sun abided by these representations.
 
 
 41
 The trial court held with respect to this claim:
 
 
 42
 With reference to Count Five, promissory estoppel, for reasons I think already given, Plaintiff could not reasonably have relied on any of the alleged promises and enforcing the alleged promises is not necessary to avoid injustice. Therefore on Count Five I will grant the Defendant's motion for summary judgment.
 
 
 43
 3 P.M., Inc. v. Basic Four Corp., 591 F.Supp. 1350 (E.D.Mich.1984) (interpreting Michigan law), supports the ruling of the district court. A plaintiff may not rely on oral statements that directly contradict the terms of a written contract. Holbrook may not have justifiably relied on alleged statements by Sun officials that the company would never initiate a TBA direct sales program or never change the price structure because the distributor agreement expressly provided otherwise. The district court's grant of summary judgment to defendant on this issue is accordingly affirmed.
 
 E. Account Stated
 
 44
 Along with its answer to plaintiff's complaint, the defendant filed a counterclaim, which was an account stated action to collect money owed to it by the plaintiff. The trial court found the account to be stated and granted summary judgment for the defendant. Plaintiff now argues that the account stated claim should have been defeated on grounds of fraud and tender of payment.
 
 
 45
 The distributor agreement expressly provides for passage of title to the plaintiff upon delivery of any goods purchased from the defendant. It also provides that all invoices are due fifteen days into the month following receipt. Michigan law recites that a settled account is conclusive between the parties unless some fraud, mistake, or inaccuracy in the account is shown. See Davis v. Kramer Brothers Freight Lines, Inc., 373 Mich. 594, 130 N.W.2d 419 (1964). "The grounds for impeachment of an account stated must relate to it and not to matters of anterior liability, except for evidence having its foundation in matters of anterior liability which shows fraud, error, or mistake." 1A C.J.S. Account Stated Sec. 34. The plaintiff claims that the account stated is invalid because of the defendant's alleged deceit in refusing for several months to reveal its intention to initiate a direct sales program. The trial court, however, granted summary judgment in favor of the defendant on plaintiff's fraud claim, and that decision has not been challenged. In addition, the plaintiff has not objected to the accuracy of the account, and thus has, as a matter of law, admitted its correctness. See Hawley v. Professional Credit Bureau, Inc., 354 Mich. 500, 76 N.W.2d 835 (1956).
 
 
 46
 Plaintiff also claims that the defendant orally agreed to repurchase the inventory and credit the plaintiff's account (a tender of payment defense). The plaintiff argues that "there can be no account stated if the parties involved subsequently make an agreement concerning any amounts due." These discussions involving the inventory, however, occurred during settlement negotiations. An agreement by defendant during the course of such negotiations would not be admissible against defendant. We affirm the district court's grant of summary judgment on this issue.
 
 
 47
 We AFFIRM the district court in all respects except on the denial of defendant's motion for a new trial on the question of compensatory damages for intentional interference with business relations. We REVERSE and REMAND in that respect only for a new trial on such damages.
 
 
 
 [1]
 The Onachuks apparently continue to own and operate a gas station, which has always been a part of its corporate operation
 
 
 [2]
 Jahnke conceded that Holbrook's profit and loss figure for a five year period ending in 1985 reflected a loss, and he made no allocation of the Onachuks' salaries to the distributor business, as opposed to the gas station operation, during that period. He was unable also to separate profits generated by the sale of Sun products from profits generated by other products distributed by Holbrook
 
 
 [3]
 Holbrook also argues that it acted as the exclusive distributor of Sun for nine years. This claim, however, directly contradicts paragraph 2 of the distributor agreement: "It is not the intent of this Agreement ... to permit the Distributor to represent himself as the exclusive supplier of such TBA merchandise to Company branded independent service station dealers." The contract clearly provides that the distributorship is nonexclusive