**AMERICAN PROFESSIONAL TESTING SERVICE, INC., Plaintiff–Appellant–Cross–Appellee,**

v.

**HARCOURT BRACE JOVANOVICH LEGAL AND PROFESSIONAL PUBLICATIONS, INC., Defendant–Appellee–Cross–Appellant.**

Nos. 95–56513, 95–56523.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1996.

Decided March 11, 1997.

John G. Roberts, Jr., Adam H. Charnes, Hogan & Hartson, Washington, D.C.; Thomas G. Jackson, Phillips Nizer Benjamin Krim & Ballon, New York City; Marc E. Golden, Riley & Reiner, Los Angeles, California, for the plaintiff-appellant-cross-appellee.

Richard R. Mainland, Fulbright & Jaworski, Los Angeles, California; George M. Borkowski, Mitchell, Silberberg & Knupp, Los Angeles, California; Stephen M. Axinn, Skadden, Arps, Slate, Meagher & Flom, New York City, for the defendant-appellee-cross-appellant.

Before: PREGERSON, D.W. NELSON, and O'SCANNLAIN, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the sponsor of BAR/BRI, the nation's dominant bar review course, violated the Sherman Act by distributing disparaging fliers about, and hiring a faculty member away from, the sponsor of Barpassers, one of its competitors.

I

Bar review companies offer courses to recent law school graduates who are preparing to sit for a state bar examination. The bar examination of most states includes a "multistate" portion consisting of a standardized 200 question multiple-choice test (identical in all states), and a state-law component that tests the law of the particular state offering the examination. A full service bar review course prepares a student for both portions of a state's bar examination: multistate and state law. A supplemental bar review course prepares a student for only one portion of a state's bar examination.

Bar review course sponsors compete for potential customers on law school campuses through distribution of advertising fliers, sponsored student events, and advertisements in student newspapers. These businesses promote their courses directly to law students throughout their three years of law school. Some law students are employed as sales representatives to market courses to their classmates, and full-time sales personnel "table sit" at law schools to promote their firm's courses.

American Professional Testing Service, Inc. ("American") provides full service bar review courses under the name Barpassers, offers supplemental bar review courses under the name APTS Multistate Maximizer, and publishes legal study aids under the name Sum & Substance. Harcourt Brace Jovanovich Legal and Professional Publications, Inc. ("Harcourt") provides full service bar review courses under the name BAR/BRI, offers supplemental bar review courses

under the name Gilbert Multistate Workshop, and publishes legal study aids under the name Gilbert Legal Summaries.

Harcourt offers its BAR/BRI course in 46 states and enrolls far more students than its nearest competitor. Harcourt owns and operates BAR/BRI bar review courses in 26 jurisdictions and has license agreements with licensees in another 20 states.[1] Barpassers was first offered in California in preparation for the Winter 1986 bar examination. Barpassers has been offered continuously in California since that time, in Arizona since 1992, and in Nevada and Florida since 1993.

In September 1991, American became a wholly-owned subsidiary of College Bound, Inc. ("CBI"). Seven months later, a receiver was appointed for CBI in an action commenced by the U.S. Securities and Exchange Commission. CBI, under fire from federal regulators for overstating revenue and earnings by millions of dollars, filed for bankruptcy protection and was subsequently placed under the control of a Chapter 11 Trustee. In July 1992, CBI disposed of its entire interest in American.

According to American, Harcourt seized on CBI's troubles to "launch a campaign to forestall competition from American" through the distribution on law school campuses of anonymous advertising fliers that suggested that American was implicated in the SEC investigation and might not be able to continue to offer its bar review courses because of CBI's bankruptcy. However, American and its officers were never the subject of the SEC investigation or even accused of fraud or securities violations. Nonetheless, American allegedly suffered "a tremendous drop in enrollments and concomitant loss of profits." American claims Harcourt offered its courses at below-cost prices, provided gratuities to law school administrators to obtain preferential treatment, and ripped down American's advertising materials. American also maintains that Harcourt's alleged predatory hiring of American Professor Robert Jarvis, who also taught at BAR/BRI, "crippled American's effort to compete in the Florida market."

In May 1992, American filed this action alleging that Harcourt engaged in actual and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; unlawful mergers and acquisitions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13; false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition; tortious interference with contractual relations; trade libel; and violations of California's Unfair Practices Act. Harcourt filed counterclaims alleging violation of the Lanham Act and various state-law torts.

In April and May 1994, the case was tried before a jury, which returned special verdicts for American on its claims under § 2, the Lanham Act, tortious interference and unfair competition, but against American and for Harcourt on its claims that American had violated the Lanham Act and had engaged in tortious interference and unfair competition. Trial testimony lasted 11 days, during which the jury heard 29 witnesses and the court admitted over 140 exhibits into evidence. The jury was given a detailed 37–page special verdict form to guide its deliberations. After finding injury proximately caused by Harcourt's exclusionary conduct, the jury awarded American damages (before trebling) of $784,753 for injury in California, $121,000 for injury in Florida, and $110,000 for injury in New York.

The district court subsequently granted Harcourt's motion for judgment as a matter of law ("JMOL") on the Sherman Act claim,

---

1. In 1967, the Bar Review Institute, Inc. ("BRI") bar review course was founded in Illinois by Richard Conviser and others. In the early 1970s, Bay Area Review, Inc. ("BAR") offered a bar review course in California. In 1974, Harcourt Brace Jovanovich, Inc., acquired BAR and BRI. BAR and BRI merged into Harcourt and began doing business under the trade name "BAR/BRI." By 1974, BAR and BRI were offering full service bar review courses in various jurisdictions. BRI was offering full service bar review courses in Illinois, Arizona, Colorado, Washington D.C., Georgia, New Jersey, Texas, Pennsylvania, Virginia, and Maryland (as a joint venture). BAR was offering full service bar review courses in California and other Western states. BAR and BRI, as part of a joint venture, began offering a bar review course in New York in 1973 under the name BAR/BRI.

concluding that there was insufficient evidence that Harcourt either (i) engaged in exclusionary conduct in violation of the Sherman Act or (ii) possessed monopoly power or a dangerous probability of obtaining monopoly power in any market. The district court also denied a motion for a new trial. American and Harcourt each filed timely notices of appeal.

After the jury verdicts, the parties settled all claims except for American's § 2 allegation and court costs which are the subject of these appeals.

## II

Considering first the Sherman Act claim, we must determine whether the district court erred in overturning the jury's factual findings that: (a) Harcourt's disparagement of American constituted exclusionary conduct in California; (b) Harcourt's predatory hiring of American's faculty member constituted exclusionary conduct in Florida; and (c) Harcourt's anti-competitive conduct in the relevant markets resulted in a dangerous probability of monopolization.

■ While the disparagement of a rival or compromising a rival's employee may be unethical and even impair the opportunities of a rival, its harmful effects on competitors are ordinarily not significant enough to warrant recognition under § 2 of the Sherman Act. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S.Ct. 2578, 2589, 125 L.Ed.2d 168 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'") (citation omitted); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993)

("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.... Thus, this Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it."); *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 370 (9th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) ("The goal of the antitrust laws, ... unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors.") We therefore insist on a "preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer)" before these practices can rise to the level of exclusionary conduct. 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b at 278 (1978).

■ To succeed on its claim for actual monopolization under § 2, American must prove Harcourt: (i) possessed monopoly power in the relevant markets; (ii) willfully acquired or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust injury. *Movie 1 & 2 v. United Artists*, 909 F.2d 1245, 1254 (9th Cir. 1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). American urges that it has made a preliminary showing of two grounds of exclusionary conduct and a dangerous probability of monopolization.[2]

## A

American first argues that the district court erred in overturning the jury's factual determination that Harcourt's implementation of a campaign designed to disparage American's bar review courses in the California, Arizona, Florida, New York, and national bar review markets through the distribution

---

**2.** American alleged that Harcourt intended to monopolize the full service bar review market of those states in which it possesses monopoly power. BAR/BRI allegedly enjoyed a complete monopoly or control, either by itself or through an affiliation, of over 70% of the full service bar review markets in Georgia, Minnesota, Alabama, Nevada, Hawaii, North Carolina, Colorado, Kentucky, Mississippi, Tennessee, South Carolina, Wyoming, Florida, New Jersey and Pennsylvania. In those states where it has substantial competition, Harcourt allegedly has pursued a policy of offering students substantial discounts from the price which they would pay for a full service bar review course if they contracted for the course at a time early in their education.

of anonymous, false, and deceptive advertising fliers on law school campuses constituted exclusionary conduct. We disagree.

While false or misleading advertising directed solely at a single competitor may not be competition on the merits, the fliers in question must have a significant and enduring adverse impact on competition itself in the relevant markets to rise to the level of an antitrust violation.

> False statements about rivals can obstruct competition on the merits and possess no off-setting redeeming virtues. But distinguishing false statements on which buyers do, or ought reasonably to, rely from customary puffing is not easy. Even at common law, this is 'a tort that never has been greatly favored.' More importantly, the effects upon a rival would usually be very speculative, especially when disparagement is not systematic. Many buyers, moreover, recognize disparagement as non-objective and highly biased. Although hardly a justification for falsehood, buyer distrust of a seller's disparaging comments about a rival seller should caution us against attaching much weight to isolated examples of disparagement. Essential, therefore, is a serious de minimis test. *"We would go further and suggest that such claims should presumptively be ignored."*

*Antitrust Law,* ¶ 737b at 280–81.

■ To prove that Harcourt's false and misleading advertising constituted exclusionary conduct, the disparagement must overcome a presumption that the effect on competition of the fliers was de minimis. *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.,* 850 F.2d 904, 916 (2d Cir. 1988). "[A] plaintiff may overcome de minimis presumption 'by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals.'" *Id.* (citation omitted). American must satisfy *all* six elements to overcome de minimis pre-

sumption. Otherwise, American fails to prove its claim.

■ Assuming American's testimony and evidence at trial is correct, the entire disparagement claim hinges on five fliers: "SEC Sues BARPASSERS' Parent Company, Questions Its Enrollment, Financial Health," "CAN BARPASSERS AFFORD TO KEEP THE LIGHTS ON?," "Federal Judge Appoints Receiver To Run Parent of APTS, Barpassers," "BARPASSERS', APTS' parent files for BANKRUPTCY." These fliers were distributed on law school campuses during a two-month period. American also relied on a survey conducted by Dr. Michael Kamins to demonstrate how the fliers suggested to law students that American was in "financial trouble, might be unable to operate its bar review courses, and had been accused of fraud by the SEC." For example, 53 percent of the survey respondents had some belief in or agreed with the statement that "because of its financial circumstances, I would expect the Barpassers course in the future to be less beneficial to me." Furthermore, the district court found that the "fliers came at a bad time for [American]; they surfaced at California (also Arizona and Florida) law schools during the time third year law students had to make financial decisions and pay the tuition for bar review courses, and there is evidence that the usual increase in sign-ups for [American's] course did not occur for that year, substantially injuring profitability for that year."

However, American presented little evidence, other than the survey, that law students were "clearly likely" to rely on the fliers or that Harcourt's false advertising was not readily susceptible to neutralization or other offset by American. The argument that its neutralization efforts were not completely successful is unavailing; the test refers to "susceptible to neutralization" not "successful in neutralization."

For these reasons, we conclude that the district court did not err in its judgment as to the disparagement of rival issue.

## B

■ American next argues that the jury properly found Harcourt guilty of predatory

conduct in Florida for hiring Professor Robert Jarvis, a well-known Florida law professor, away from American. Jarvis, who began working for American in March 1992, agreed to teach Florida constitutional law for Barpassers in August 1992. In 1991 and 1992, Jarvis also taught for BAR/BRI. After Jarvis accepted American's offer to teach the Florida Barpassers course, Harcourt countered with an offer that precluded Jarvis' continued work for American or any other bar review course. Jarvis accepted Harcourt's offer which included increased compensation and greater lecturing and administrative duties.

American does not allege that Harcourt hired any other Barpassers instructor. Absent a continued pattern of compromising American's employees, this one-time hiring of Jarvis by Harcourt is not sufficient to constitute an antitrust violation: "Nor should the actual compromising of rival employees be grounds for § 2 liability in the absence of a continued pattern of such behavior or of reason to believe that the actual effect was probably significant." *Antitrust Law*, ¶ 737b at 281.

Most importantly, this court's decision in *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.*, 914 F.2d 1256 (9th Cir. 1990) is controlling on these facts. There, we reviewed whether there were any genuine issues of material fact with respect to Universal's claim that MacNeal's hiring of five of Universal's six key technical employees in 1986 and 1987 was predatory in violation of § 2. This was the first reported case of a claimed § 2 violation as a result of alleged employee raiding or predatory hiring. *Universal Analytics* held that an internal memo of the producer referring to "wounding" of a competitor by hiring key technical employees showed at most that a secondary motivation of the hirings was to disadvantage competition and was insufficient to show predatory conduct in violation of the Sherman Act. "Unlawful predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor. Such cases can be proved by showing the hiring was made with such predatory intent, i.e. to harm the competition

without helping the monopolist, or by showing a clear nonuse in fact." *Id.* at 1258. Absent either of those circumstances, the court agreed with Professors Areeda and Turner that the hiring should not be held exclusionary:

> Acquiring talent not to use it but to deny it to possible rivals is exclusionary. Such an arrangement has the same harmful tendency and the same lack of redeeming virtue as the promise by a non-employee that he will not compete with the monopolist. But unlike the latter agreement whose existence or nonexistence is a rather clear-cut question, exclusionary employment would be hard to identify. A monopolist would probably use important talent once acquired. And the court should not try to judge whether the acquired talent was used more effectively than readily available alternative personnel. Nor should it try to do so when the defendant pursues a hard-to-match, if not unmatchable, program of recruiting, say, young researchers in his field. In the absence, therefore, of the monopolist's proved subjective intent to hire talent preclusively or of clear nonuse in fact, employment should not be held exclusionary.

*Id.* (quoting from *Antitrust Law*, ¶ 702b at 110).

Because American failed to meet the two-prong test set forth in *Universal Analytics* (harm American without helping Harcourt or Harcourt did not use Jarvis' services), we conclude that the district court did not err in its judgment as to the predatory hiring issue.

### C

▪ American next argues that the district court erred in overturning the jury's factual finding that Harcourt's anti-competitive conduct resulted in a dangerous probability of monopolization. To establish a § 2 violation for an attempt to monopolize, American must show, inter alia, that there is a dangerous probability that Harcourt will achieve monopoly power. *See Spectrum Sports*, 506 U.S. at 455–460, 113 S.Ct. at 890–892.

■ Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Mere proof of exclusionary conduct is not sufficient to prove Harcourt's dangerous probability of success; other proof of market power is required. *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. at 892 (concluding that dangerous probability of success element is "plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics.... [D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market *and the defendant's economic power in that market.*") (emphasis added).

■ Even if Harcourt has a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion. The Ninth Circuit in *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995), addressed the final factors in market power analysis: barriers to entry and barriers to expansion.

> A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price.
>
> Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale. In evaluating entry barriers, we focus on their ability to constrain not "those already in the market, but ... those who would enter but are prevented from doing so."

*Id.* at 1439 (citations and footnote omitted).

■ The only entry barrier upon which American relies on appeal is Harcourt's reputation for offering high quality courses. Contrary to American's argument, reputation alone does not constitute a sufficient entry barrier in this Circuit. *See United States v. Syufy Enterprises,* 903 F.2d 659, 669 (9th Cir.1990) ("We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition.") (citations omitted). Moreover, the existence of 29 bar review courses in California suggests that any barriers to entry may not be that significant.

In light of the persuasive precedent of this court, we conclude that there was insufficient evidence of a dangerous probability of monopoly power in the relevant markets.[3] The district court did not err in its judgment as to the monopoly power issue.

## III

■ Finally, Harcourt contends that it is entitled to costs because it "prevailed *in toto* with respect to the part of the case that the parties did not settle." We disagree. Following the jury verdicts (not including the § 2 claims), Harcourt prevailed on all but three of American's claims against Harcourt. American prevailed on: (1) its Lanham Act claim, 15 U.S.C. 1125(a), where a verdict was rendered in favor of American in the amount of $700,000; (2) its interference with actual and prospective economic advantage claim, where a verdict was rendered in favor of American in the amount of $236,442; and (3) its California Business & Professions Code

3. American argues that the district court ignored the jury's award of $110,000 (before trebling) of damages specifically arising from Harcourt's monopoly attempt in New York. American claims that the trial evidence established that it was forced to abandon plans to offer its Barpassers course in New York as a result of Harcourt's alleged anti-competitive conduct in California. Because Harcourt is not liable for attempted monopolization in California and American failed to prove evidence on its New York claim, American's argument is unavailing.

claim. Harcourt prevailed on all of its counterclaims against American except for the violation of California Business & Professions Code §§ 17040, 17043, 17045; trade libel; violation of Arizona Revised Statutes §§ 44–1481 (unfair competition); and violation of Florida Statutes ch. 501.204 (unfair competition). While the parties did settle all of these remaining unfair competition claims, district courts often order both parties to bear their own costs when both prevail in whole or in part at trial. *See Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.,* 898 F.2d 512, 517 (7th Cir.1990); *Johnson v. Nordstrom–Larpenteur Agency, Inc.,* 623 F.2d 1279 (8th Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980).

Because Harcourt offers no evidence that the district court abused its discretion, we conclude that the court did not err in ordering Harcourt and American to bear their own costs.

### IV

For the foregoing reasons, we affirm the district court's orders granting the judgment as a matter of law and providing that each party bear its own costs.[4]

AFFIRMED.

---

4. Harcourt also cross-appeals various evidentiary rulings at trial. In light of our decision to affirm the JMOL, we need not rule on those contentions.