to have had a solely malicious purpose. As these letters were intended for sophisticated parties, easily countered by plaintiff, and violated no federal law, we hold that they did not constitute unethical conduct or a "per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law." On the contrary, vigorous advertisement is a normal part of competition. The other activities alleged, discussed *supra*, are also part and parcel of normal competition between rivals, and as such cannot be described as unethical.

**IV.**

For the foregoing reasons, the judgment of the district court is **affirmed**.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0074P (6th Cir.)
File Name: 03a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

AMERICAN COUNCIL OF
CERTIFIED PODIATRIC
PHYSICIANS AND SURGEONS,
          *Plaintiff-Appellant,*

          *v.*

AMERICAN BOARD OF
PODIATRIC SURGERY, INC.,
          *Defendant-Appellee,*

AMERICAN PODIATRIC
MEDICAL ASSOCIATION,
          *Defendant.*

No. 01-1578

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 93-72995—Bernard A. Friedman, District Judge.

Argued: December 10, 2002

Decided and Filed: March 11, 2003

Before:  NORRIS and GILMAN, Circuit Judges;
McKEAGUE, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:**  H. Laddie Montague, Jr., BERGER & MONTAGUE, Philadelphia, Pennsylvania, for Appellant. Philip J. Kessler, BUTZEL LONG, Detroit, Michigan, for Appellee. **ON BRIEF:** H. Laddie Montague, Jr., BERGER & MONTAGUE, Philadelphia, Pennsylvania, Alan M. Sandals, SANDALS & LANGER, Philadelphia, Pennsylvania, for Appellant.  Philip J. Kessler, Laurie J. Michelson, BUTZEL LONG, Detroit, Michigan, Gordon J. Walker, BUTZEL LONG, Bloomfield Hills, Michigan, for Appellee.

_____

**OPINION**

_____

ALAN E. NORRIS, Circuit Judge.  The plaintiff and defendant in this antitrust and tortious interference action are both professional associations of podiatrists that provide certification services.  The American Council of Certified Podiatric Physicians and Surgeons ("ACCPPS"), the plaintiff, was formed by dissatisfied podiatrists as an alternative to the American Board of Podiatric Surgery ("ABPS"), the defendant, and began certification of podiatrists in competition with the ABPS in 1987.  In a previous appeal, this court affirmed in part and reversed in part the district court's grant of summary judgment in favor of ABPS.  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am.*

---

[*] The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

illegal conduct) is sufficient to make out a tortious interference claim.  The case relied on most heavily by plaintiff is *Trepel v. Pontiac Osteopathic Hospital*, 135 Mich. App. 361, 354 N.W.2d 341 (1984).  In *Trepel*, the court held that sending letters "knowing them to contain false allegations" constitutes unethical conduct for the purpose of a tortious interference claim.  135 Mich. App at 377, 354 N.W.2d at 348.  Because this court previously held that none of the challenged statements are false, *Trepel* is easily distinguishable.[12]

Plaintiff also cites to *Wilkinson v. Powe,* 300 Mich. 275, 1 N.W.2d 539 (1942), as holding that the sending of disparaging written materials can support a claim of tortious interference.  In that case, the defendant operated its own trucks to pick up milk from farmers and also employed independent truck drivers to do so.  When it decided to no longer use plaintiff's truck, the defendant informed dairy farmers of that fact.  *Wilkinson*, 300 Mich. at 279, 1 N.W.2d at 541.  The Michigan Supreme Court held that if the defendant had merely stopped its business relationship with the plaintiff, no liability would follow, but the sending of letters to plaintiff's customers to this effect constituted toritious interference.  *Wilkinson*, 300 Mich. at 283-84, 1 N.W.2d at 542-43.

We believe that Michigan courts would decline to extend *Wilkinson* to a case in which a business mailed materials that are best characterized as advertisements for its services.  Some statements contained in the letters were, at worst, true but misleading.  These letters, however, were attempts to solicit business, whereas the defendant in *Wilkinson* appears

---

[12] Another case cited by plaintiff, *Monette v. AM-7-7 Baking Co., Ltd.,* 929 F.2d 276 (6th Cir. 1991), involves conduct not at issue here. *See id.* at 283 (applying Michigan law and holding that defendant's deceitful tactics in obtaining plaintiff's customer list could sustain a tortious interference claim).

### III.

In order to establish tortious interference with a business relationship, a plaintiff must show, *inter alia*, that the defendant performed an "illegal, unethical, or fraudulent" act. *Weitting v. McFeeters,* 104 Mich.App. 188, 198, 304 N.W.2d 525, 530 (1981). Another Michigan court has explained that the plaintiff must allege "the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green,* 138 Mich.App. 360, 369 N.W.2d 881, 886 (1984).

The district court granted summary judgment on the theory that defendant's mailings were constitutionally protected speech under the commercial speech doctrine. Memorandum Opinion, Mar. 30, 2001 at 5-6. We need not reach the constitutional issue, however, because we conclude that the activity alleged cannot rise to the level of tortious interference under Michigan law.

Because we affirm summary judgment on the antitrust claim, plaintiff must rely on a number of cases in which Michigan courts held that unethical conduct (as opposed to

---

products.

*Id.* at 783.

Unlike the case at hand, *Conwood* involved a broad pattern of anticompetitive activities, and the complaint did not rest primarily on misleading statements. In addition, the court in *Conwood* recognized the potential for sales managers in stores to be duped by the misleading claims, in part because snuff sales were an insignificant part of the retail sales of the stores. *Id.* at 776. Also, the statements made by the USTC were characterized as false instead of true but misleading. For example, the sales data provided by the USTC to retailers was inaccurate. *Id.*

*Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999). The case is before this court again after the district court on remand granted summary judgment on all remaining claims. The remaining issue on remand involved whether the ABPS, by sending out mass mailings extolling its virtues and criticizing its rivals, violated section 2 of the Sherman Anti-Trust Act ("Sherman Act"), corresponding sections of the Michigan Antitrust Reform Act, and Michigan common law.

### I.

This action has a lengthy history. In 1993, plaintiff filed suit against defendant and the American Podiatric Medical Association, an organization closely related to defendant. The factual basis of the complaint relied primarily on three mass mailings sent out by defendant over several years to between 7,000 and 8,000 hospitals and insurance companies. Plaintiff claimed that these mailings were false and misleading in violation of the Lanham Act, 15 U.S.C. § 1125. In addition, plaintiff alleged that the mailings were part of a conspiracy to preserve and extend the monopoly power of defendant in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, corresponding sections of the Michigan Antitrust Reform Act, M.C.L. § 445.772-3, and the common law prohibition on intentional interference with prospective business advantage.[1]

The relationships and history of the two parties and the main conduct at issue were discussed in the prior opinion by this court. *Certified Podiatric Physicians*, 185 F.3d at 611-12. In that appeal, this court upheld a grant of judgment as a matter of law on the Lanham Act claims and upheld summary

---

[1] Because the Michigan Anti-Trust statute and the Sherman Anti-Trust Act mirror each other, we apply the same analysis to both the federal and state anti-trust claims. *Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 919 n.6 (6th Cir. 2002). In any event, plaintiff has not provided a separate analysis under Michigan's statute.

judgment on Sherman Act section 1 claims, but reversed summary judgment on Sherman Act section 2 and Michigan common law claims. Section 1 claims were dismissed because plaintiff could not allege a conspiracy as a matter of law.[2] *Id*. at 621-22. With regard to the Lanham Act claims, this court held as follows:

> [T]he intended audience [of the statements at issue] is comprised of hospital administrators, insurance companies, and managed care organizations, a sophisticated group of professionals who presumably have familiarity with the issues involved in board certification. Because we conclude that this intended audience would find all of the challenged statements to be, at worst, either ambiguous or true but misleading, the district court correctly reasoned that plaintiff had to present evidence of actual deception in order to survive the ABPS's renewed motion for judgment as a matter of law and collect damages [under the Lanham Act].

*Id*. at 616. This court then affirmed the district court's conclusion that evidence of actual deception was lacking.

While we held that there were no viable Lanham Act and section 1 claims, we also held that plaintiff had presented enough evidence of the existence of monopoly power to warrant a trial on that prong of a section 2 monopolization claim.[3] However, we specifically declined to reach the issue

---

[2] As a consequence, no claims involving the American Podiatric Medical Association remain.

[3] In addition to defendant's large market share (roughly 75%), this court noted that defendant charged more for its certification services, and therefore evidence existed that would permit a jury to conclude that defendant had pricing power. *Certified Podiatric Physicians*, 185 F.3d at 623. We also held that a question of material fact existed as to whether defendant was protected by a "reputational" barrier to entry. *Id.*

---

to make a decision." The defendant does not have the same authority or power as the American Society of Mechanical Engineers did in *Hydrolevel*. The Court's concern in *Hydrolevel* involved the dealings of the professional association with individuals or corporations and the ability of insiders to use the standards of the association to harm their rivals. This ability was lacking in *Schachar*, as it is in the case at hand. Therefore, no reasonable jury could conclude that the challenged statements, the "call to arms," and the promotional activities of defendant's members violated the Sherman Act.[11]

---

[11] Plaintiff also points us to a case recently decided by this circuit that addressed advertisement as part of a broad pattern of anticompetitive conduct. *Conwood Co., v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), involved two distributors of moist snuff. In finding that the practices alleged were sufficient as a matter of law to sustain a jury verdict in favor of Conwood, this circuit reasoned as follows:

> USTC [United States Tobbacco Co.] contends that none of the practices Conwood complains of amount to antitrust violations, but are no more than isolated sporadic torts. We disagree. Conwood presented evidence that beginning in 1990 USTC began a systematic effort to exclude competition from the moist snuff market. Conwood presented sufficient evidence that USTC sought to achieve its goals of excluding competition and competitors' products by numerous avenues. Conwood principally complains that USTC (1) removed racks from stores without the permission of store management and discarded and/or destroyed these racks, while placing Conwood products in USTC racks in an effort to bury Conwood's products and reduce their facings; (2) trained their "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section," in an effort to destroy Conwood racks; (3) misused its position as category manager by providing misleading information to retailers in an effort to dupe retailers into believing, among other things, that USTC products were better selling so that retailers would carry USTC products and discontinue carrying Conwood products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals'

distinguished the situation in *Schachar* from other professional association cases, including *Hydrolevel*, because they involved de facto enforcement devices.[10]   *Id.* at 399. The court also distinguished between advocacy and the ability to enforce standards:

> *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284 (5th Cir. 1988), holds that when a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws. We agree. An organization's towering reputation does not reduce its freedom to speak out. Speech informed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor.

*Id.* at 399-400 (citation omitted).

Defendant cites to testimony in a deposition by plaintiff's director in which he admitted that defendant did not have the power to control a medical board and did not "believe [defendant] could force [a hospital accreditation] committee

---

[10]*Schachar* was a section 1 case, and plaintiff tries to distinguish it as such. However, *Hydrolevel*, on which plaintiff partly relies, was also brought under section 1. *See Hydrolevel*, 456 U.S. at 565. Courts have recognized that the same principles, although not necessarily the same standards, underlie both sections of the Sherman Act. *See, e.g., United States v. Microsoft*, 253 F.3d 34, 70 (D.C. Cir. 2001) (noting that "[t]he basic prudential concerns relevant to §§ 1 and 2 are admittedly the same" while discussing an exclusive contract claim brought under both sections); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'n, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995) (holding that tying may violate both sections 1 and 2). We believe that both *Schachar* and *Hydrolevel* are relevant to our analysis because they both deal with the potential to exclude competition and harm rivals, and that is precisely what is being alleged here. As noted before, monopoly power is in part the power to exclude.

of whether the challenged statements could, as a matter of law, establish that defendant used illegal means to maintain or acquire its monopoly power. *Id.* at 623. Reasoning that a section 2 violation could constitute the "illegal or unethical conduct" required to make out a tortious interference claim under Michigan law, we remanded that claim as well. *Id.* at 624.

On remand, the district court granted summary judgment to defendant with respect to the Sherman Act section 2 claims, holding that the challenged statements could not constitute a section 2 violation, but declined to dismiss the tortious interference claims. Arguing that its statements were protected commercial speech under the First Amendment, defendant moved for reconsideration, and the district court granted summary judgment. The district court reasoned that the First Amendment affords protection to commercial speech that does not concern unlawful activity and is not inherently misleading.

## II.

We review a grant of summary judgment de novo. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988). A court may grant summary judgment only if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). In addition, the evidence must be viewed in the light most favorable to the non-moving party. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. A section 2 monopolization claim has two components: "(1) the possession of monopoly power in the

relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To survive summary judgment on the second element, a plaintiff must allege facts sufficient for a jury to find that the defendant acquired, maintained, or attempted to acquire a monopoly through actions harmful to competition. We now address that issue.

A. *The Mailings*

An antitrust claim premised primarily on advertising or speech must overcome a presumption that such advertising or speech had a *de minimis* effect on competition.[4] In so holding, we join the two other circuits that have adopted this *de minimis* presumption. In *National Association of Pharmaceutical Manufacturers v. Ayerst Laboratories*, 850

---

[4] In opposition, plaintiff relies heavily on *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980). In that case, the eighth circuit held that when an airline used false, misleading, and deceptive advertising to counter a competitive threat, it violated section 1 of the Sherman Act. *Id.* at 1268. In addition, the court held that evidence supported findings that the airline, which had monopoly power over certain routes, forced a travel agency to cancel its participation in travel group charters. *Id.* at 1270. This was held to be a section 2 violation. *Id.*

*International Travel Arrangers* is distinguishable on at least two grounds. First, the statements at issue in *International Travel Arrangers* were "false, misleading, and deceptive." *Id.* at 1264. The challenged statements at issue here can hardly be characterized as "false, misleading, and deceptive" in light of our previous holding. Second, there was a much greater pattern of practice in *International Travel Arrangers*. There was evidence that the defendant airline in *International Travel Arrangers* tried to persuade travel agents to stop dealing with a rival and threatened to retaliate against them. *Id.* at 1272.

of defendant had the authority to exclude competition at their respective hospitals. As such, they merely acted as advocates of an organization in which they held membership, which is a permissible competitive activity.

The Supreme Court has held that the activities of professional associations may require careful antitrust scrutiny given the unique potential of such organizations to exclude competition. Plaintiff relies heavily on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982), in which the Supreme Court held as follows:

> Furthermore, a standard-setting organization like ASME [American Society of Mechanical Engineers] can be rife with opportunities for anticompetitive activity. Many of ASME's officials are associated with members of the industries regulated by ASME's codes. Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions with ASME, at least in part, as an opportunity to benefit their employers. When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes.

*Id.* at 571.

In opposition, defendant points to *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989). In *Schachar*, the seventh circuit affirmed a jury verdict that the defendant American Academy of Ophthalmology did not violate antitrust laws by describing radial keratotomy as "experimental." *Id.* at 398. The court noted that the case should not even have reached a jury, in part because the defendant could not require hospitals to withhold permission for the procedure. *Id.* Thus, the court

that the statements were not "clearly false." This court previously held that the statements were, at worst, true but misleading for the purposes of the Lanham Act.[8] 185 F.3d at 616. Second, the record clearly establishes that any negative effects of the statements could be cured with relative ease by plaintiff. Defendant cites testimony that plaintiff was able to send mailings to the health care community to counter the mailings sent forth by defendant. Plaintiff does not rebut the evidence that it could easily cure the allegedly misleading statements, and it clearly did so in a number of instances. Indeed, it could directly contact the individuals targeted by defendant and did not have to engage in a series of expensive media campaigns.

B. *Other Conduct*

Plaintiff relies heavily on what it calls "defendant's multifaceted conduct" in arguing that the district court erred in granting summary judgment. The conduct alleged in addition to the mailings focused primarily on a "call to arms" issued by defendant to its members to promote vigorously defendant's accreditation services and the sometimes successful attempts by those affiliated with defendant to have its accreditation service recognized exclusively by certain healthcare providers.[9] However, these other allegations, combined with the mass mailings, are insufficient to support a section 2 claim because there is no evidence that members

---

[8] In deciding that the challenged statements were not deceptive, we previously considered the sophistication of the targeted parties. *Certified Podiatric Physicians*, 185 F.3d at 616. Thus, we considered the fourth element of the *American Professional Testing* test (the sophistication of the parties) in deciding the information was not clearly false (the first element).

[9] We note that plaintiff has made no allegation that exclusive recognition agreements have excluded it from a significant portion of the market.

---

F.2d 904 (2d Cir. 1988), the second circuit held that a "plaintiff asserting a monopolization claim based on misleading advertising 'must overcome a presumption that the effect on competition of such a practice was *de minimis.*'" *Id.* at 916 (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 288 n.41 (2d Cir. 1980)). In *Berkey Photo,* the second circuit held as follows with regard to advertising:

[I]n its advertising, a producer is ordinarily permitted, much like an advocate at law, to bathe his cause in the best light possible. Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2.

*Id.* at 287-288 (footnotes omitted).[5]

The ninth circuit, in *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 108 F.3d 1147 (9th Cir. 1997), also adopted a *de minimus* presumption and laid out a six-part test that a plaintiff must satisfy to rebut the presumption: the statements at issue must be (1) clearly false; (2) clearly

---

[5] Plaintiff cites to *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95 (5th Cir. 1988), as standing for the proposition that even truthful advertising can support a section 2 claim if it creates a barrier to entry. In *Phototron*, the fifth circuit noted that "[a]dvertising that creates barriers to entry in a market constitutes predatory behavior that the antitrust laws are designed to prevent." *Id.* at 100. The cost to entry that concerned the court in *Phototron*, however, involved the high costs of purchasing advertising to counter a claim or establish one's product in the face of advertising by the monopolist in a traditional consumer market. *Id.* at 101. In the instant case, the targets of the mailings were sophisticated parties. In addition, the plaintiff can respond relatively cheaply through its own mailings, and it presumably can directly contact the individuals targeted by defendant and need not engage in a series of expensive media campaigns. Defendant points to uncontested evidence that plaintiff did precisely that.

material; (3) clearly likely to induce unreasonable reliance; (4) made to unsophisticated parties; (5) continued for long periods; and (6) not readily cured by rivals.[6] *American Professional Testing*, 108 F.3d at 1152. *See also In re Indep. Serv. Org. Antitrust Litig.*, 114 F. Supp. 2d 1070, 1095 (D. Kan. 2000) (citing *American Professional Testing* and *Ayerst Labs.* in support of the *de minimis* presumption for "disparaging comments"). The ninth circuit also made clear that all of these factors must be met for the case to survive summary judgment. *Id.* The district court relied heavily on the test in *American Professional Testing* when it granted summary judgment.

We believe that all of the factors listed in *American Professional Testing* are relevant, but, given the facts before us on summary judgment, we decline to consider each element or hold that all elements must be satisfied to rebut the *de minimis* presumption. We do hold, however that a plaintiff must show a genuine issue of material fact regarding at least the following two elements to rebut the *de minimus* presumption: (1) the advertising was clearly false, and (2) it would be difficult or costly for the plaintiff to counter the false advertising.

False advertising cannot help consumers, and hence cannot be defended as beneficial to competition.[7] Evidence on the

---

second element is required because even false advertising would not damage competition and hence be a violation of the Sherman Act unless it was so difficult for the plaintiff to counter that it could potentially exclude competition. Monopoly power is the power to exclude competition or control prices. *U.S. v. E.I. du Pont de Nemours & Co.* 351 U.S. 377, 391 (1956). Isolated business torts, such as falsely disparaging another's product, do not typically rise to the level of a section 2 violation unless there is a harm to competition itself. *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002). There can be no harm to competition, such as the exclusion of competitors, when the victims of false advertising are easily able to counter it. As the Supreme Court has emphasized, the Sherman Act protects competition, not competitors. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *cf. Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230-31 (3d Cir. 1988) (rejecting section 2 claim regarding defendant's disparagement of plaintiff's box office potential because defendant's conduct was "consistent with legitimate competitive conduct").

It is clear that neither of these necessary elements are present in this case. First, the law of the case has established

---

[6] This test was first suggested in 3 PHILLIP AREEDA & DAVID TURNER, ANTITRUST LAW ¶ 738a, at 278-79 (1978). The second circuit in *Ayerst* also discussed this test favorably, but it is unclear whether they thought each requirement was mandatory. *See Ayerst*, 850 F.2d at 916-17.

[7] Advertising that is "true but misleading" cannot be said to be strictly procompetitive. However, the Supreme Court has cautioned that we should be mindful of the chilling effect antitrust liability can have on permissible competitive conduct. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 593-594 (1986) ("[M]istaken

inferences in [predatory-pricing] cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect."); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 762-764 (1984) ("Permitting an agreement [in violation of section 1] to be inferred merely from the existence of complaints . . . could deter or penalize perfectly legitimate conduct.") Permitting antitrust liability for merely potentially misleading or "true but misleading statements" would chill procompetitive promotional conduct. Therefore, a plaintiff in an antitrust suit, to survive summary judgment, must present evidence that would permit a jury to conclude that the statements at issue were clearly false.